MR

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

JUL 30 2024 MCP

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

CHRISTOPHER MANSOORI

Plaintiff

v.

SGT. AMADOR et al.

Defendants

Case No. 22-cv-1642

Judge Lindsay C. Jenkins

Magistrate Jeffrey T. Gilbert

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

The Plaintiff, CHRISTOPHER MANSOORI, pro se, hereby responds to Defendant's Motion to Dismiss Plaintiff's Amended Complaint and respectfully requests this Honorable Court to deny Defendants' Motion. In support of, Plaintiff argues as follows:

## I. Introduction

On January 22, 2024, Plaintiff filed the Amended Complaint in this case. Plaintiff's articulated pleading included facts that allow the Court to infer Plaintiff was consistently exposed to second hand smoke (burnt toilet paper(wicks) and burnt toxic chemicals), the ranking Jail official Defendants were aware of the unconstitutional living condition through out the whole Jail, and the Defendants condoned the condition and failed to take the steps to correct it. On May 6, 2024, Defendants filed the present Motion to Dismiss. Through out their Motion, the Defendants misstate the alleged facts, overlook other factual allegations within the Amended Complaint,

1 of 14

make misplaced respondeat superior legal arguments, and generally distort Plaintiff's allegations. Plaintiff contends Defendants' Motion to Dismiss is nothing more than a deliberate vexation aimed to wile Plaintiff into conceding to their baseless legal position. Plaintiff's Amended Complaint sufficiently alleges injuries more than de minimis and meritoriously states claims of unconstitutional living conditions. Accordingly, Plaintiff respectfully requests this Honorable Court to deny Defendants' Motion to Dismiss Plaintiff's Amended Complaint.

## II. Defendants' "Statement of Facts" is inaccurately recited from Plaintiff's Amended Complaint. The Court should disregard it

Defendants start this section by stating, "The following pertinent facts are taken from Plaintiff's Amended Complaint and are presumed to be true solely for the purposes of this Motion to Dismiss." Plaintiff took notice that the defendants' recital distorts the specific factual allegations made, to exclude the detail that allowed the Court to infer the defendants were unaware of the systemic smoke problem. The defendants then based their legal arguments on their inaccurate portrayals of fact. None of their "facts" should be presumed, they should be disregarded or stricken, and Plaintiff's Amended Complaint can be construed itself, by the Court, to ascertain the actual facts, in consideration of Defendants' Motion to Dismiss.

## III. Standard of Review

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The statement also must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," which means that the pleaded facts must show there is "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When

Screening a pro se plaintiff's complaint, courts construe the plaintiff's allegations liberally. Erickson v. Pardus, 551 U.S. 89, 94 (2007)(per curiam). Courts also must "accept all well pleaded facts as true and draw reasonable inferences in the plaintiff's favor." Roberts v. City of Chicago, 817 F.3d 561, 564 (7th Cir. 2016).

# IV. Argument

A pretrial detainee may proceed on a correctional/jail condition's claim if the plaintiff alleges facts showing that "(1) the conditions in question are or were objectively serious...; (2) the defendant acted purposefully, knowingly, or recklessly, with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable." Hardeman v. Curran, 933 F.3d 816, 827 (7th Cir. 2019). Whether the defendant's conduct was objectively unreasonable "turns on the facts and circumstances of each particular case." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015). This standard requires "focus on the totality of facts and circumstances and to objectively gauge, with no regard to the subjective belief of the individual, whether the actions of the defendants was reasonable." Tatum v. Lucas, 2019 U.S. Dist. LEXIS 25020, *29, 2019 WL 652854 (E.D. Wis. 2019). "The personal involvement of senior jail officials... can be inferred" at the pleading stage "where the plaintiff alleges 'potentially systemic', as opposed to 'clearly localized', constitutional violations." Smith v. Dart, 803 F.3d 304, 310 n.2 (7th Cir. 2015) quoting Antonelli v. Sheahan, 81 F.3d 1422, 1428-29 (7th Cir. 1996).

In defendants' opening arguments, they state, "The Fourteenth Amendment does not require perfect conditions," and then proceed to equate Plaintiff's Amended Complaint to cases when toilets leak water on cell floors. This citation is unavailing because Plaintiff's claims against defendants rise to the level of extreme deprivation required to establish an objective violation, where leaky toilet cases do not. Plaintiff alleged for more than 20 months he was subjected to the widespread condition of toxic burnt chemicals in the air while confined, and Defendants knowingly condoned the situation by taking inadequate steps to remedy the unconstitutional living condition. What is required for a Fourteenth

Amendment conditions of confinement claim, an inmate must show that he has suffered an objectively, sufficiently serious injury. Farmer v. Brennan, 511 U.S. 825, 834(1994). An objectively, sufficiently serious injury is one that deprives the inmate "the minimal civilized measure of life's necessity." Dvorak v. Racine County Jail Sheriff, 2007 U.S. Dist, Lexis 29892 at*13(E.D. Wis. 2007). Toxic air deprives one of regular air, which is a basic human need, satisfying the threshold.

Defendants highlight that Plaintiff is required to have experienced an injury greater than de minimis pursuant to the "PLRA," in order to bring suit. They completely overlook the fact Plaintiff pled he has a valvular heart backflow condition, for which the smoke is extremely detrimental; he experienced illnesses because of the smoke; his aorta has narrowed by at least 30%; and tests for his lungs and respiratory tracts have been ordered but not yet performed. Although Defendants cite case law for stuffy noses, back and leg pain, vomiting and nausea, skin rash, and soreness, all deemed de minimis injuries, it does not apply to Plaintiff's circumstances and the injuries he claims. Defendants shall not be allowed to Diminish the fact that extremely harsh and toxic chemicals were consistently in the air, forced upon Plaintiff to breathe.(See Plaintiff's Exhibit A in its entirety and specifically at page 3 lines 11-15) Exhibit A at the citation states," Dart's spokesperson said the 'primary driver' for the record spikes in deaths was a sudden influx of paper laced w/fentanyl and other drugs that was smuggled into the jail..." The defendants' lawyers have tried to keep out that its lethal drugs Plaintiff was exposed to, calling it speculation, manipulatively ending the deposition with Antoine Pierce when they realized he was giving testimony of the drug smoke, and deceptively arguing inmates smoke "wicks." Furthermore, Cook County medical has failed to conduct the tests on Plaintiff's lungs or respiratory tract still, arguably because they do not want to validate any injuries that would further increase the value of the claims. The defendants and their lawyers conceal injuries and deaths, related to paper infused with drugs and it's smoke, to limit the liability of Cook County. Plaintiff is the leader in complaining of Defendants' conduct, he was ahead of the issue. The objectively serious injuries were imposed upon Plaintiff, but he lives well enough to write this Court about it.

Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable under §1983, an individual defendant must have caused or participated in a constitutional deprivation." Pepper v. Vill. of Oak Park, 430 F. 3d 809, 810 (7th Cir. 2005) Plaintiff has alleged facts that allows the Court to infer the Defendants personally supervised the tiers and Divisions articulated in the Amended Complaint, were aware of had Knowledge of the widespread Smoke condition through out the entire Division (tiers) and Jail, and failed to implement a means to remedy the unconstitutional living condition. Each Count in the Amended Complaint lays out which Defendant supervised that tier, where the condition is complained of, and facts are pled supporting how or why each defendant Knew those smoke filled environments existed and their failure to correct it. The personal involvement of senior jail officials can be inferred at the pleading stage where the Plaintiff alleges "potentially systemic", as opposed to "clearly localized", constitutional violations. Smith v. Dart, 803 F. 3d 304, 310 n.2 (7th Cir. 2015) quoting Antonelli v. Sheahan, 81 F. 3d 1422, 1428-29 (7th Cir. 1996). Plaintiff has sufficiently pled facts, specifically outlining how each Defendant is involved and liable and why Plaintiff is entitled to Relief.

The context in which Defendants make their respondeat superior argument, in the case at bar, is absolutely inappropriate and inapplicable. As an initial matter, Defendants' contention that Plaintiff asserted claims against them, seeking to hold them liable only in their individual capacity, is false. Plaintiff seeks to hold all Defendants liable in their Official and individual capacities. Secondly, the Defendants are not the principal, within the context of a respondeat superior premise, they are the agents of Cook County. Plaintiff did not sue Cook County, he sued the Defendants. The Defendants Notion that their high rank as sheriffs make them the principal, within the context of respondeat superior, is nothing more than comedy in litigation. The defendants are Shriffs regardless of their rank and they are the agents of their employer, Cook County. The only context of respondeat superior that would come into play in this case, is when Cook County pays Plaintiff for suing Defendants in their official capacity. Other than that, the Defendants arguments are simply a vexation hoping Plaintiff would concede. Their argument is meritless.

Plaintiff sued the Defendants based upon their personal involvement and their failures to maintain a proper environment in the jail. Their authority and higher rank does not excuse their liability, in any capacity, and any such arguments premised around this theory of respondeat superior should be struck down by the Court. They don't just supervise subordinate sheriffs, they supervise inmates full time, from the camera footage they view in live time, from the comforts of their homes and offices. (See Exhibit A page 5 at lines 3-13). Plaintiff does not hold Defendants liable vicariously, any such argument is an attempt for the Defendants to hide behind their rank as sheriffs, and excuse them from liability. Plaintiff alleges Defendants intentionally or willfully failed to correct the unconstitutional living condition, not merely that they were careless. Negligence is therefore not a factor in this suit.

## PLAINTIFF'S AMENDED COMPLAINT STATES A CAUSE OF ACTION

In addition to the foregoing, Plaintiff points out that Defendants point to Plaintiff's subjective comfort levels in the jail related to the smoke he lived with, downplaying the allegations, saying "It smelled bad and caused him congestion." This tactic by the Defendants is highly manipulative, as the standard of review requires "focus on the totality of facts and circumstances to objectively gauge, with no regard to the subjective belief..." Tatum v. Lucas, supra. Pursuant to Smith v. Dart (7ᵗʰ Cir. 2015), supra, Plaintiff pled enough factual detail to establish the Defendants, senior jail officials, were personally and individually involved with the relevant constitutional living condition violation. The process of reaching such a legal conclusion includes objectively gauging the totality of the facts and circumstances, whereas the defendants narrowly focus on subjective beliefs of Plaintiff's and isolate facts. Plaintiff's Amended Complaint therefore must prevail.

A. Counts ~~C.M.~~ Seven, and Eight Should not be Dismissed in their Entirety

Plaintiff concedes to Defendants' argument that Count one should be dismissed,

Plaintiff challenges Defendants' arguments Count 7 should be dismissed. Plaintiff alleged he consistently had to breathe the smoke and that the tier was a Hub or Distribution point, within the entire Division 6. This factual allegation goes towards the weight of the systemic problem in the whole jail, that drugs were abundant in paper form and were consistently smoked on tiers, the basis of holding Senior Jail officials personally and specifically responsible for the conditions. So when Plaintiff stated, "I name the same exact defendants from Count 6 for this Count," he intended to hold Lt. Holmes, Superintendent McCray, and Beauchem responsible. They were the same senior supervisor Jail officials responsible for controlling living conditions as when Plaintiff was on tier 2R of Division 6, for Count 6. This is not group pleading in a conclusory manner as Defendants argue. These defendants were personally responsible for controlling Plaintiff's living environment, they had knowledge of the smoke issue, and they failed to adequately remedy the problem.

Defendants argue Plaintiff failed to allege facts sufficient to suggest that any of the defendants "knowingly condoned" the conduct. According to Merriam-Webster Dictionary, condone means "to overlook or forgive esp. by treating an offense as harmless or trivial." What the Defendants condone, can be inferred from the facts Plaintiff alleged. Plaintiff pled McCray personally caught wicks for 3 weeks and then abandoned those efforts. This allows one to infer McCray had knowledge of the unconstitutional condition and then at some point she willfully overlooked the state of the tier. As Plaintiff alleged, nearly two more months went by on tier 2R in Count 6 and she was not seen again. As Plaintiff moved to tier 2N in Count 7, she was not seen enforcing any constitutional living standard, nor anyone on her instructions enforced an acceptable living environment. Plaintiff also states in his Amended Complaint, Lt. Holmes doesn't change 20% of the smoking environment. Well that allows the Court to infer the other 80% of the time, Lt. Holmes is overlooking the smokey state of the tier. Similarly, Plaintiff alleged Sgt. Amador searched once, but doesn't change 99% of the smoke Plaintiff was forced to breathe. "Not doing enough" is a cheap way to distort the allegation that the defendants willfully overlooked smoking for a vast majority of the time, even though they knew, Plaintiff and other inmates, were locked in with lethal chemicals in

7 of 14

the air. It was not until February of 2023 did the jail openly give notice to avoid consumption of the toxic paper drugs, once the executives realized this litigation coupled with many deaths, left them susceptible to claims (see Exhibit B, their poster attached).

Defendants argue Count 8 should be dismissed because it does not "set forth any facts upon which individual liability may be inferred, that its insufficiently pled, that its vague group pleading, and that there is no specific allegation or example of any unreasonable conduct." Plaintiff argues that a majority of his claims are cumulative, where the facts alleged in one count carry over into the next or subsequent counts. Plaintiff sufficiently pled and detailed the knowledge each defendant possessed prior to Count 8, as it relates to the widespread condition of toxic smoke in the air within the jail, Plaintiff also sufficiently plead prior to Count 8, the supervisory roles each defendant had. These pleaded facts, viewed in total, or cumulatively, allow the court to infer the defendants named in the Count 8, had a responsibility to stop the condition or remedy it because it was within the scope of their knowledge, duty, and control. (See Plaintiff's Exhibit C where Queen was definitively on Notice as of June 13, 2021); (see Plaintiff's Exhibit D where Holmes signed the report on July 6, 2021, a time period Beacham was the superintendent in Division 6, both were definitively aware of the condition); and (see Plaintiff's Exhibit E, where Sheriff's inadvertently came across the entire drug scheme, described in paragraph two of the report, signed by Holmes again on October 18, 2021, when superintendent McCray was ahead of Division 6). Liability can be inferred in Count 8 (and Count 7) based on the uncorrected environment Plaintiff was subjected to and the named Defendants responsibility, to remedy such a systemic unconstitutional condition. The Defendants have also suppressed a lot of requested Discovery, as it is set forth in the Motion to Compel, should be considered.

B. Plaintiff States a Claim Against Sgt. Amador

What Defendants specifically exclude in their statement of facts for Count Four is that C.O. Niklas and Miskell watched inmates smoking; and no one stopped the tier from being smoke filled with toxic drugs. Sgt. Amador would do rounds or checks on the tier, but as

Plaintiff plead "Amador did not combat the smoke or do much to prevent me from having to breathe smoke constantly, I name Sgt. Amador as a Defendant for being indifferent 99% of the time." Plaintiff plead he caught a wick once. Plaintiff was on the relevant tier for over forty days, Sgt. Amador caught one wick, one day, when ten more were burning, and things continuously burned. That day he grabbed the wick because the inmate was so belligerent, not because his intention was to stop the smoke. Amador possessed the knowledge the tier was smoke filled because he walked onto the tier everyday he worked and witnessed the foggy haze, but he intentionally overlooked the living condition. Additionally, reports in Discovery have been withheld where Sgt. Amador investigated and removed an inmate who was caught in between a bad paper drug transaction, worth thousands, It's one of many reports Defendants have not disclosed, as the Motion to Compel requests. This should be taken into consideration at this point, when Defendant seeks to claim he had no knowledge of the living conditions and maintains he was objectively reasonable within his conduct. Being indifferent 99% of the time, allows the Court to infer that Defendant overlooked smoke on the tier, making him liable. By Defendant overlooking the smoke, he encouraged his subordinates to do the same by example. This is far from any respondeat superior premise or theory. The defendant makes arguments that inaccurately recite Plaintiff's accounts and attempt to describe Plaintiff's subjective belief, such as, "Plaintiff pointed out Sgt. was not deliberately indifferent, coming on to the tier personally and catching an inmate with a wick, he infers is reasonable" and "Plaintiff's opinion that he did not personally see Sgt. Amador come on the tier as often as Plaintiff would like does not indicate that his actions were objectively unreasonable," which is highly manipulative and should be given ZERO weight in consideration. Exhibit C states "remnants of ash were found throughout the dayroom and in numerous cells," a fact that would become collective knowledge among the sheriffs, including Amador. When Defendant argues "Plaintiff fails to plead any facts supporting the conclusory allegation that C.O.'s need his presence to search cells, which never happened,'" this is also manipulative. Pursuant to Judicial rulings a regular sheriff is not supposed to enter an inmate's cell without higher ranking supervision, a fact the Prisoner Amended

9 of 14

Complaint form specifically instructs on," Do not give any legal arguments or cite any cases or statutes." The fact Sgt. Amador caught a wick once, as Plaintiff pled, allows the Court to infer Amador had knowledge of smoking on the tier. Wicks are used to light drugs. Upon finding a lit wick, a lay person could deduce there are more drugs to be lit and smoked, a plausible fact Amador would have been presumed to have known. Yet he failed to follow up on the living condition of the tiers because he generally condoned the systemic problem in the section of the jail he supervised. Defendants' arguments are manipulative and distorting, yet still fall short.

## C. Plaintiff States a Claim Against Defendant Beachem

As an initial matter, holding the defendant liable in a supervisory capacity is not synonymous with a respondeat superior claim, as Defendants argue it. Beachem and the other Defendants were personally aware of the drug smoke throughout the jail as it was continuous. Their role as a senior supervisor involves a personal involvement over all jail activities, including inmates and sheriffs' conduct alike, and addressing any unconstitutional living conditions in effect. A respondeat superior claim would entail holding Beachem liable as the Master, responsible for his subordinates faults. Plaintiff did not structure his claim under this premise, he sued Beachem for failing to remedy a condition he knew existed, as he was completely in control to make the corrections. His rank as a "superior" does not limit his liability, when he knowingly overlooked the smoke with out regard to the condition Plaintiff was forced to endure. "To state a claim, a detainee must allege facts supporting an inference that he was housed under conditions that were objectively serious enough to deny a basic human need and that jail officials possessed a purposeful, a knowing, or possibly a reckless state of mind toward the detainees situation." Smith v. Dart, 803 F. 3d 304, 309 (7th Cir. 2015)

Defendant's arguments focus on Plaintiff's subjective beliefs (speculation) and isolate the facts and circumstances, to narrowly gauge the reasonableness of Beachem. This is against the standard of assessment defined in Tatum v. Lucas, 2019, supra, "This standard requires

focus on the totality of facts and circumstances and to objectively gauge, with no regard to the subjective belief," so when Defendant states, "Plaintiff acknowledges Beachem was doing searches, just not as much as he would have liked" it should be given minimal weight in consideration of their Motion to Dismiss. Conducting few searches is arguably objectively unreasonable, when that act clearly does not remedy the continuous smoke condition, The defendant did not implement a corrective solution, in complete disregard of the situation, This conclusion is plausible when gauging the facts alleged, in Total. Because Plaintiff's foregoing arguments address Defendants' other arguments on Beachem's behalf, Plaintiff will not redundantly argue each of those issues. Plaintiff sufficiently pled facts that state a claim against Defendant Beachem.

## D. Plaintiff States a Claim Against Superintendent McCray

In Count 6, when Plaintiff alleged McCray personally combatted the wicks for three weeks, this allowed the Court to infer she had personal knowledge of the continuous smoke condition. As Plaintiff alleged in his amended complaint, McCray abandoned those efforts and Plaintiff remained on the tier for approximately two more months, with the smoke filled condition of the tier unresolved, This allows the Court to infer that McCray knowingly overlooked or forgave the smoking, exactly the reason she is a defendant. Defendants' arguments of what Plaintiff's subjective feelings or thoughts related to this, holds zero weight and should be disregarded by this Court. The objective assessment allows the Court to find that Plaintiff sufficiently stated a claim against Defendant McCray.

Additionally, Plaintiff did not only allege McCray failed to hire more staff, he pled she also failed to keep enough sheriffs on duty, to effectively prevent smoke. The sheriffs were cross-watching tiers, and with their absence, inmates smoked freely in the dayroom, profusely. (See also Plaintiff's Exhibit A at page 4), (See also Plaintiff's Exhibits F and G attached). The Defendant's argument conveniently skips over this allegation, therefore their argument related to "hiring" is too narrow and should be given zero weight. Plaintiff's earlier arguments on Defendants' respondent superior contentions apply here also, Plaintiff sufficiently states a claim

against Defendant McCray, based on the foregoing.

E. <u>Plaintiff Sufficiently States a Claim Against Defendant Queen in every Count</u>

In Count Four, Plaintiff layed claim to the time period May 13, 2021 through June 21, 2021 and the Defendants' conduct, while Plaintiff was housed on tier M2 of Division 4. Within this Count, Sgt. Amador and Superintendent (Now Director) Queen, are the named Defendants. Plaintiff alleged a search was conducted during this time period (see Exhibit C attached), but never pled "Superintendent Queen conducted at least one Search of cells" as Defendants argue. One search in five weeks, when its clearly within the defendants' knowledge that smoke is continuously in the air, is objectively unreasonable. Exhibit C, supports Plaintiff's allegation that drugs were continuously smoked and clouds lingered, the report indicates ashes were found everywhere. Ashes are proof of previously burning substances and smoke can be inferred from such evidence. This condition was on every tier, a systemic problem, Queen had knowledge of, but recklessly overlooked it during the time period complained of, and/or failed to correct it.

Plaintiff alleged Superintendent Queen did nothing to instruct a higher standard for staff to enforce. In other words, Defendant failed to correct an unconstitutional living condition, a proper inference this Court deduced from the Amended Complaint. Defendants' argument that Plaintiff's allegation translates to "Defendant failed to train or supervise others" is inaccurate and misplaced. Defendants take Plaintiff's allegations out of context to form legal arguments.

Failing to correct an unconstitutional living condition, that is within the defendants' knowledge, amounts to objectively unreasonableness, which the Court can infer from the facts pled. Defendants' attempt to focus on Plaintiff's subjective view or opinion, of a higher standard, is too narrow, when assessing the Defendants' conduct. Viewing the facts and circumstances in total, with out consideration to anyone's subjective beliefs, objectively gauging her conduct, it is reasonable to draw the inference, smoke was a systemic problem within the defendant's

Knowledge, and she overlooked it consciously, so that it remained an issue. This denied Plaintiff a basic human need. Plaintiff sufficiently states a claim against Defendant Cavern.

## F. PLAINTIFF Sufficiently States a Claim against Lt. Holmes

Plaintiff did not sue Lt. Holmes simply because he replied to a grievance and processed it. Rather, Plaintiff highlighted the grievance in the allegations to support the element that Lt. Holmes had knowledge of the systemic smoke issue, combined with the facts alleged that he failed to remedy the condition. He was personally involved, as he participated in tier searches himself. His grievance response dated November 23, 2021, control number 202115275, states, "As a result of the smoking on the tiers we are doing more searches." Yet Plaintiff alleged he had not changed more than 20% of the smoke filled environment, during the time complained of. This allows the Court to infer that the other 80% of the time, Lt. Holmes was overlooking the unconstitutional living condition and failed to correct it. Objectively, this is unreasonable conduct. Holmes knew of the consistent issue of smoke, but took minimal steps in furtherance of correcting the problem. This left Plaintiff in an unconstitutional environment most of the time. Additionally, this response by Lt. Holmes, was in response to Plaintiff grieving and detailing all of the drug use and wick smoke. As grievance procedures outline, (which is already before this Court in the Motion For Summary Judgement on the limited issue of Exhaustion, pending in five cases), the Executives of the Jail have meetings to discuss grievance issues, which would have officially put him or all Defendants on notice officially, allowing the Court to draw the inference all Defendants possessed this knowledge, a fact relevant to all counts. As such, Lt. Holmes should remain a defendant in this case.

# V. Conclusion

Many of the foregoing arguments are relevant and applicable to each separate issue the Defendants raise. Therefore, Plaintiff respectfully requests the Court to construe his

responsive pleading cumulatively, in the sense that relevant arguments are applied and considered on each issue, through out. If this Court concludes that the language Plaintiff used in his Amended Complaint is grounds for dismissing any defendant, Plaintiff respectfully requests leave to file a second Amended complaint to cure any such deficiencies.

Wherefore, CHRISTOPHER MANSOORI, pro se, prays this Honorable Court DENIES Defendants' Motion to Dismiss Plaintiff's Amended complaint, for all of the reasons stated herein. In the alternative, in the event any of the Defendants are dismissed from this action, Plaintiff respectfully seeks leave to file a second Amended complaint, to cure any deficiency.

Respectfully submitted,
Christopher Mansoori

Pursuant to 28 U.S.C. §1746, the undersigned certifies the foregoing is true and correct, except as to matters therein stated on information and belief, and as to such matters verily believes the same to be true.

Dated: 7/21/24      Christopher Mansoori
Christopher Mansoori
2019100719\
2700 S. California
Chicago IL 60608

I, Christopher Mansoori, swear under penalty of perjury, that I filed Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Amended complaint, in case # 22-CV-1648, with the Clerk of the United States District Court, by handing the document to Jail staff, for outgoing mail, on 7/22/24, in an envelope with proper postage, addressed to: Prisoner Correspondence, United States District Courthouse, 219 S. Dearborn, Chicago IL 60604. Defense Counsel accepts notice through the Clerk's ECF System.

Christopher Mansoori

# Injustice Watch

DYING ON DART'S WATCH

# Cook County Jail's deadliest year in decades reveals repeated lapses and failed oversight

Eighteen people died at the jail last year, and half of the deaths featured examples of inadequate supervision and medical care, an Injustice Watch investigation found. Sheriff Tom Dart blames detainees overdosing on drug-laced paper and says he's addressed the problem, but experts say there's a renewed need for oversight.

 by Carlos Ballesteros    June 12, 2024

The day before he died, Daniel Colon appeared in bond court via Zoom from a holding cell at 26th and California. The hearing was only a formality — his fate had already been decided — but as the judge was about to send him off, Colon spoke out of turn.

"Hold on, hold on, hold on," he said.

"So the warrant from four years ago, I have to stay here for? Can you explain that?"

Colon ended up in bond court last February after Chicago police arrested him on the exit ramp off the Dan Ryan Expressway in Englewood where he often asked for spare change. The five officers who surrounded him that day said they were taking him in because of a warrant for missing court in 2018 for possessing 5 grams of heroin.

When Colon asked the cops why now, he got only cryptic answers. "Something has to be done now, all right? Nobody wanted this to happen," the arresting officer told him, according to audio footage from the officers' body-worn cameras.

The warning signs were already there. Colon's wrists were so swollen, the handcuffs wouldn't fit. Still, the cops took the 28-year-old to the 9th District police station in Bridgeport, where he spent the night in lockup, and then to the criminal courthouse the next day, where Cook County Judge David L. Kelly answered Colon's questions almost as fast as he had asked them; the warrant was set at no bail and Colon was due back in court in four days "You'll be able to address it with the judge at that time, sir," Kelly said.

Colon never made it back to court.

After the hearing, Colon was taken to Cook County Jail, where he told the jail's medical staff at intake that he was a daily heroin user and complained about cold sweats, diarrhea, vomiting, and stomach cramps — all symptoms of opioid withdrawal, which can quickly turn deadly.

Medical staff prescribed him a cocktail of seven medications and sent him to the jail's highly touted detox housing.

Colon died less than 24 hours later.

Surveillance footage reviewed by state police investigators shows Colon went to his detention pod's shared bathroom at 12:18 a.m. after writhing in pain on his cot, and sat on the toilet for seven hours. Detainees reported hearing Colon in distress throughout the night.

Under state law, detainees are required to be monitored at least every 30 minutes. The officers on duty told investigators they checked on him five times during the night and he declined their offers for medical treatment, but surveillance footage showed no officers entered the bathroom between 3:30 and 6:45 a.m.

Exhibit A

Shortly after 7 a.m., a guard entered the bathroom, and then walked out. Within seconds, Colon crawled out of the stall and ended up on his back facing a surveillance camera. No one noticed for 35 minutes, until another detainee alerted guards to Colon's condition. It took another four minutes for medical staff to arrive at the scene.

By then, it was too late. Colon was cold to the touch.

More than a year after his death, Colon's family cried as they learned the details of his death for the first time from an Injustice Watch reporter.

"No one deserves to die like that," said his younger sister, Jamie Colon. "I mean, they basically abandoned him! He was only there for a day!"

A yearlong Injustice Watch investigation into deaths at the Cook County Jail reveals the lack of supervision contributing to Colon's death is not unique.

## 2023 was the deadliest year at the Cook County Jail in decades

**More people died last year than in any year since 2013, when the jail population was twice as high. As a percentage of the jail's average daily population, 2023 had the highest jail mortality rate on record — more than twice the most recent national average — at 3.4 deaths per 1,000 detainees.**



Note: 2020 includes 10 people who died from Covid-19.
Source: Cook County Sheriff's Office and University of Illinois at Chicago / Cermak Health Services · Get the data · Created with Datawrapper

Eighteen people died while incarcerated at the jail in 2023, the most deaths at the jail since 2013, when the daily population was twice as high. It marked the jail's highest mortality rate since at least 1995, according to an Injustice Watch analysis of public records and historical jail death figures compiled by University of Illinois researchers.

A review of thousands of pages of internal jail records, police investigations, and autopsy reports found inadequate supervision and medical care preceded at least half of those deaths, almost all of which have gone unpunished.

There was the 26-year-old with an undiagnosed brain tumor whose repeated complaints about severe headaches were ignored; the 28-year-old officers failed to check on for more than an hour only to end up brutally murdered by his cellmate; and the 33-year-old found hanging in his cell while the understaffed jail's medical wing personnel failed to check on detainees every half-hour as required.

2

Sheriff Tom Dart — who's overseen the jail for close to two decades — failed to properly inform state regulators and the deceased's family members of the troubling circumstances behind the deaths in his custody, despite Illinois law requiring his office to provide them with those answers.

Dart declined to speak with Injustice Watch. Instead, he directed his communications staff to provide responses to questions sent over the past three months.

Dart's top spokesperson acknowledged it was "not acceptable that staff failed to intervene after seeing Mr. Colon in the bathroom for hours" but declined to discuss specifics in his case and many others, citing ongoing internal investigations.

He defended Dart's record of oversight and transparency, saying each death goes through several internal reviews and external probes conducted by state police and county prosecutors. When policy violations are identified, officers and other staff members are punished and reminded to follow the rules, Dart's spokesperson said.

"No one is hiding anything, and to imply otherwise is disingenuous," he said.



Dart's spokesperson said the "primary driver" for the record spike in deaths was a sudden influx of paper laced with fentanyl and other drugs that was smuggled into the jail in the first half of last year.

Indeed, drug overdose was the cause of death for eight detainees in 2023, followed by six from natural causes (including Colon), three homicides, and one suicide, according to records from the Cook County medical examiner.

Deaths and overdoses at the jail plummeted after Dart severely restricted access to paper last April, going so far as to block defense attorneys from bringing paper into the jail. As of this week, there had been no deaths at the jail in 2024, his spokesperson said. The jail's average daily population has also dropped significantly following the abolition of cash bail in Illinois.

But even in some overdose deaths, Injustice Watch found potential policy violations and lack of oversight that may have dangerously increased the jail's reaction time to offer medical assistance, and advocates and experts say Injustice Watch's findings point to longstanding problems at the jail that run deeper than drug-laced paper.

Inadequate supervision and medical care at the jail were at the heart of a 2010 court-ordered consent decree in which Dart was forced to accept federal monitoring after a scathing U.S. Department of Justice investigation found "unconstitutional living conditions" at the then-overcrowded jail. A federal judge lifted the consent decree in 2017 after the county hired hundreds of new officers, increased training, and installed thousands of surveillance cameras — the first time the jail was free from federal oversight in more than four decades, a point of pride in Dart's tenure.

But the repeated instances of inadequate supervision Injustice Watch found in its review of last year's deaths illustrate the need for renewed outside oversight of the jail, said Michele Deitch, a leading national expert on correctional oversight and director of the Prison and Jail Innovation Lab at the University of Texas at Austin.

Deitch reviewed Injustice Watch's findings and said Cook County officials should create an independent oversight body to permanently monitor the jail, investigate deaths in custody, catch issues before they become trends, and provide the public and the families of detainees with regular updates about what goes on inside.

"Deaths in custody go to the heart of whether or not we're keeping people in jail safe," Deitch said. Independent jail oversight bodies — which exist in cities including Los Angeles, Seattle, and New York City — are best suited to "hold the agency accountable when they're not living up to our values, expectations, or constitutional requirements," she said.

In response, Dart's spokesperson said, "Civilian oversight is no panacea for preventing jail deaths."

In a statement, Cook County Board President Toni Preckwinkle said the 18 deaths at the jail last year were "incredibly concerning," but stopped short of calling for greater oversight.

## Supervision issues reemerge in jail deaths

To compile this report, Injustice Watch obtained thousands of documents through dozens of public records requests to Dart's office, the medical examiner, the Illinois Department of Corrections, and the Illinois State Police's Public Integrity Task Force, which investigated 14 of the 18 deaths at the jail last year.

Obtaining even basic information like the names of those who died at the jail required a records request, as Dart doesn't publish a list of people who die in his custody, unlike sheriffs in other large cities including Los Angeles and Phoenix. Dart's office and other county agencies heavily redacted some of the records they provided and refused to produce other records altogether, including shift logs and surveillance footage of Colon's final hours, saying releasing them would interfere with an ongoing investigation.

Injustice Watch compiled key information about each person who died at the jail — such as the unit where they died, the cause of death, the time of death, and how long they had been incarcerated — to determine if the staff's response followed Dart's internal policies and promises for reform outlined in the court-ordered consent decree of 2010.

What emerged from the review were many lapses.

Most notably, records showed Dart's office is still using the controversial practice of having a single officer supervise two tiers on the same shift, known as "cross-watching."

As part of the federal consent decree, Dart promised he would "work to eliminate the practice" after the Justice Department said it had led to "multiple preventable deaths." But the jail's former court-appointed monitor, Susan McCampbell, acknowledged Dart is no longer required to abide by the agreement. "No jurisdiction is required to keep policies/procedures/practices in place when the consent agreement is no longer in effect," she wrote in an email.

Injustice Watch found cross-watching played a significant role in the death of Michael O'Connor last year.

The 33-year-old was found hanging in his cell on Christmas more than an hour after he was last seen alive by one of only 24 officers assigned to supervise nearly 800 detainees diagnosed with physical and mental health issues, records show.

Jail staff had a difficult time finding enough officers to work on Christmas, Dart's spokesperson said.

That explanation wasn't enough for O'Connor's mother. "They left my son to die, and no one was there to stop it," Valentina O'Connor said.



Valentina O'Connor looks through a bag of letters and documents from her son, Michael O'Connor Jr., who was found hanging in his cell. **Sebastián Hidalgo for Injustice Watch**

Asked for records showing how often detainees were cross-watched last year, attorneys in Dart's office said no one kept track of those figures — a lack of oversight in stark contrast to Dart's oft-proclaimed penchant for data.

But records show at least three other detainees aside from O'Connor died on days in which their tier was being cross-watched for at least one shift.

Dart's spokesperson acknowledged cross-watching should be "avoided as much as possible" but defended its practice as both legal and common in "many correctional facilities around the country."

Even when tiers were properly staffed, records show three deceased detainees were in need of medical assistance or were already dead for an hour or longer before officers realized it.

Besides Colon and O'Connor, 28-year-old Marvell Reasonover wasn't checked for at least an hour before officers found him bludgeoned to death in the jail's maximum security division last March by his cellmate, who records show had assaulted another detainee just days before.

4

Dart's spokesperson said the sheriff's office "understands not only the legal requirement to perform 30-minute checks, but also the importance of these checks to protect the health and the safety of individuals in custody."

According to the spokesperson, Dart's jail supervisors brought disciplinary charges against nearly 100 officers last year for failing to perform their legally required 30-minute checks.

Still, guards failed to perform their 30-minute checks in 12% of shifts reviewed last year by the Jail and Detention Standards Unit of the Illinois Department of Corrections, which monitors all county jails statewide.

Dart's spokesperson said those statistics showed an 88% compliance rate last year and also pointed to the jail's state-of-the-art, 3,500-camera video surveillance system — operated by a team of full-time officers "watching live security feeds during overnight shifts" — as further proof of the jail's adequate supervision.

But he also noted that live video monitoring ends at 5:30 a.m. and said the primary focus was on ensuring tier guards were performing the required 30-minute checks.

"There is no current expectation that every single incident or development in a living unit be actively monitored via video in real time," Dart's spokesperson said.

None of the officers who were supposed to be supervising O'Connor, Reasonover, or Colon have yet to face disciplinary action in those cases, records show.

Union officials for Teamsters Local 700, which represents the more than 2,000 correctional officers who work at the jail, did not return messages seeking comment.

Injustice Watch has sued the Cook County medical examiner for the release of surveillance video related to Colon's and Reasonover's deaths under the Illinois Freedom of Information Act. Those cases are still pending in Cook County Circuit Court.

## Detainees' families left scrambling for answers

Injustice Watch found examples of inadequate medical care and delayed responses to medical emergencies in the lead up to at least four deaths at the jail in 2023.

Only the deceased's next of kin is able to request and access those records. Injustice Watch helped two mothers navigate the bureaucratic process to obtain their sons' medical records.

In one of those cases, records show Makavelle Sampson, 26, had complained about severe headaches days before he died of an overdose in September. An autopsy later found Sampson had a 2-inch-thick brain tumor that went undetected in the six years he was incarcerated pre-trial at the jail. A county pathologist said the tumor was a significant contributing factor in his death.

Sampson's mother said her son would complain about his headaches almost every time they talked on the phone. "I just kept telling him to put in requests for medical. … It hurts to know he wasn't helped," Nakisha Sampson said.

In the other case, records show Terron Richardson, 33, had a history of refusing to take his prescribed medications before dying from a seizure in May 2023. However, on the day he died at the jail's hospital, an officer tried to alert medical staff of his condition, but the medical staff member "simply walks away," according to an internal investigation.

A spokesperson for Cermak Health Services, the division of Cook County Health that renders medical services in the jail, said the involved medical staff member no longer works for the county.

The jail's medical director, Dr. Priscilla Ware, declined an interview request.

Three officers assigned to Richardson's unit — Lt. Albert Stubenvoll and deputies Bruno F. Roti and Xavier Collier — faced disciplinary charges over his death, records show.

Investigators found Roti failed to appropriately respond to a medical emergency and falsified work-related records. He was recommended for termination, but retired before the case was completed, Dart's spokesperson said.

Jail supervisors recommended a 45-day suspension for Stubenvoll and a 120-day suspension for Collier, but they haven't served their suspensions yet, and neither have been relieved of their police powers in the meantime, Dart's spokesperson said.



(From left): Sandra Ward, Isaac Ward, and Sharron Wesley hold photos and memorials to Terron Richardson, their grandson and son, who died after suffering a seizure in the Cook County Jail last year. **Sebastián Hidalgo for Injustice Watch**

Richardson's mother, Sharron Wesley, told Injustice Watch she was never informed about the internal investigation into her son's death, which was closed three months ago.

"That was my baby, and they won't tell me what the hell happened to him," she said.

Lack of transparency with the families of the deceased is a common thread in all cases, Injustice Watch found.

The families of six detainees who died all said they were left with basic questions about what happened to their loved ones in Dart's custody, despite a state law requiring the sheriff to appoint one of his staff members to serve as a liaison for each family and provide them with answers.

Nina Singleton, 35, was visibly unwell in the mental health unit the night before she died from an overdose — so much so she needed help from three detainees to get to her bed, records show. She was dead by medical call the next morning.

Her mother, Nicole Brown, said a member of Dart's office told her that her daughter had died but never followed up.

"I tried to contact him afterwards trying to see what was going on … and he apologized for no one getting back to me, but that was it," she said.

Dart's spokesperson acknowledged the sheriff's office should be doing more to keep families informed. "Clearly, if family members feel that they are in the dark, there is more that we can do," he said.

## Jail deaths show oversight is faltering, expert says

Families of the deceased are not the only ones missing critical information about deaths under Dart's watch.

State law requires sheriffs to file reports about deaths in their custody within 30 days to state regulators with basic information, including the decedent's name, age, and "a brief description of causes, contributing factors and the circumstances surrounding the death."

Injustice Watch obtained all of the reports submitted to the state's Jail and Detention Standards Unit by Dart's office since the start of his first term in December 2006. The reports have grown thinner in recent years, and failed to include required information about the circumstances behind the deaths in each of the 18 cases from 2023.

In the section labeled "summary of specific details of occurrence" for the report about Colon's death, for example, Dart's office only reported his time of death, and failed to include any of the grisly details — details known to jail officials the day Colon died.

Omitting key details about detainees' deaths defeats the purpose of the reports, which are meant to improve oversight and inform state officials and the public about conditions in the jail, said Jennifer Vollen-Katz, executive director of the John Howard Association of Illinois, an independent watchdog group that monitors the state's prisons and, in the past, also monitored Cook County Jail.

"Reports that do not contain the statutorily required information thwart this effort and undermine efforts to keep people in custody safe," Vollen-Katz said.

Dart's staff provided no explanation for the inadequate reports to state officials, but said that any omissions were inadvertent and that his office is "incredibly transparent with stakeholders regarding deaths in custody."

In a statement, a spokesperson for the Illinois Department of Corrections said members of the Jail and Detention Standards Unit are "actively reviewing" the incomplete death reports submitted by Dart's office "and working with them to improve reporting."

All deaths in custody also trigger an investigation with the sheriff's own Office of Professional Review, which handles disciplinary cases against guards and other staff.

Aside from the three officers disciplined for Richardson's death, only one other officer has received any punishment over deaths in custody last year so far, while half of the investigations remain open, even for deaths from nearly 500 days ago, records show.



Nina Singleton's parents, Nicole and Michael Brown, look over records an Injustice Watch reporter helped them obtain about their daughter's overdose death in the Cook County Jail last year. **Abel Uribe for Injustice Watch**

Dart's senior level staff also conducts internal reviews for each in-custody death to identify broader policy violations and issue recommendations.

In early April, when Injustice Watch requested copies of the internal probes, Dart's staff had finished reviewing only six of the 18 deaths from last year. His spokesperson said eight more have been completed since then.

The corrective changes stemming from the six reviews provided to Injustice Watch mostly involved reminding staff to follow basic protocols. For example, in the weeks and months after Colon died, guards were reminded via emails and at roll call to check the whole bathroom area during their 30-minute security checks and to call for medical attention when detainees are in distress. The reminders included no mention of Colon or the lapses that preceded his death, records show.

Most of last year's deaths were also investigated by the state police at the request of the sheriff's office and forwarded to county prosecutors. But the Cook County State's Attorney's Office has so far not filed criminal charges against anyone involved in the deaths, meaning the police investigations end up shelved and rarely see the light of day.

Ultimately, the investigations and death reviews are better at identifying individual policy violations than systemic issues that percolate from the top down, said Deitch, the correctional oversight expert at the University of Texas at Austin.

"If each and every case is looked at just on its own, then you're never going to notice patterns," she said.

When asked if he would welcome independent oversight of the jail, Dart's spokesperson said his boss is already "held accountable daily by a host of government agencies, elected officials, and the citizens who elect him and other office holders."

Yet none of those efforts have so far resulted in anyone being held accountable in Colon's death. A year and a half later, his sister has low expectations.

"I don't think they'll do right by my brother."

# WARNING

# PLEASE READ

The use, sale or possession of any drug or illicit substance is strictly prohibited for your safety. There is always the risk of overdose because of how potent synthetic narcotics are and what substances the drugs are cut with including soaked paper. Regardless of the method of ingestion, any use of drugs is highly dangerous to you.

If you have been abusing any drug in any capacity, and need help, please ask staff for professional help. If you notice illegal drugs on the tier or in your living area, stay away from them and notify staff.

Any use or ingestion of illicit substances are prohibited per CCDOC Rules and Regulations. Please understand that this may cost you your life.

 

Exhibit B



# COOK COUNTY SHERIFF'S OFFICE
## BUREAU OF INFORMATION AND TECHNOLOGY
### COOK COUNTY OFFENDER MANAGEMENT SYSTEM
### (CCOMS)



User ID:  N Aguirre

## INCIDENT REPORT

☑DNA

| ELECTRONIC MONITORING - IF APPLICABLE | | | |
|---|---|---|---|
| WATCH: | BEAT: | GPS#: | BODY WORN CAMERA EVENT: |
| RETRIEVED EQUIPMENT: | CR NUMBER: | ADDRESS OF OCCURRENCE STREET: | ADDRESS OF OCCURRENCE ROOM/FLOOR: |
| ADDRESS OF OCCURRENCE CITY: | ADDRESS OF OCCURRENCE STATE: | ADDRESS OF OCCURRENCE ZIP: | |

| VIDEO (BWC, STATIONARY, HANDHELD) INFORMATION - MANDATORY FIELDS | | |
|---|---|---|
| STATIONARY CAMERA CAPTURE FOOTAGE<br>Yes | HANDHELD CAMERA UTILIZED:<br>No | BWC UTILIZED<br>No |
| *LIST CAMER NUMBERS:<br>DIV 4-CAM 2.009, 2.010 | *IDENTIFICATION NUMBER: | *LIST STAFF MEMBERS & BWC SERIAL NUMBERS |
| *DID YOU REVIEW THE STATIONARY FOOTAGE:<br>Yes | *DID YOU REVIEW HANDHELD FOOTAGE: | * DID YOU REVIEW THE BWC FOOTAGE: |
| *IF NO, EXPLAIN: | * IF NO, EXPLAIN: | * REASON FOR NOT REVIEWING BWC FOOTAGE |

| ASSESSMENT: |
|---|
| In summary, while monitoring Division 4 via overhead stationary cameras, Reporting Lieutenant Judkins #754 observed an inmate, positively identified as Houston, William #20200823119 in the dayroom of tier M2 igniting a fire using the tier microwave (Camera DIV 4-CAM 2.009 and 2.010 at 1815 hours).  Inmate Houston then went to various cells on the tier.  R/Lt. ordered the removal of the microwave from the tier and a search of the tier.  At 1942 hours divisional staff entered the tier and conducted this search. Various excess sheets, blankets, uniforms, DOC issued food, foil used to start the fires, and remnants of ash were found throughout the dayroom and in numerous cells.  All excess items and contraband were removed from the tier.  Discipline will be issued to inmate Houston for arson, who will remain on tier pending Hearing Board review.<br><br>AO Line Inv. Hyzynski #6241 notified at 2041 hours issuing tracking #92606<br>Supt. Queen and AED Gavin notified via email/report |

| USE OF FORCE: INCIDENT INFORMATION – IF APPLICABLE | |
|---|---|
| IS THE OFFENSE/INCIDENT REPORT WRITTEN IN SPECIFIC TERMS IN ORDER TO CAPTURE THE DETAILS OF THE INCIDENT? | DOES THE OFFENSE/INCIDENT REPORT INCLUDE A DESCRIPTION OF THE APPLICATION(S) OF RESTRAINT OR CONTROL (i.e. restraints, spit masks) AND THE MANNER IN WHICH IT WAS USED? |
| DOES THE OFFENSE/INCIDENT REPORT CONTAIN AN ACCURATE ACCOUND OF EVENTS LEADING TO THE USE OF FORCE? | DOES THE SUPERVISOR'S ASSESSMENT DESCRIBE THE NATURE AND EXTENT OF APPARENT & REPORTED INJURIES SUSTAINED BOTH BY STAFF AND SUBJECT(S)? |
| DOES THE OFFENSE/INCIDENT REPORT DESCRIBE IN DETAIL THE TYPE AND AMOUNT OF FORCE USED AS WELL AS THE PRECISE ACTIONS TAKEN IN A PARTICULAR INCIDENT? | DOES THE OFFENSE/INCIDENT, USE OF FORCE REPORT(S) OR THE SUPERVISOR'S ASSESSMENT CONTAIN THE DATE AND TIME MEDICAL ATTENTION WAS ACTUALLY PROVIDED? |
| AFTER DEBRIEFING THE INCIDENT WITH STAFF, IS THE DESCRIPTION OF THE INCIDENT IN THE CCOMS NARRATIVE CONSISTENT WITH ACCESSIBLE VIDEO(S)? | DID THE SUBJECT(S) MAKE ANY ALLEGATIONS AGAINST STAFF? |
| AFTER REVIEWING ALL MATERIAL ACCESSIBLE DO YOU BELIEVE THE FORCE USED WAS IN ACCORDANCE WITH CCSO POLICY AND PROCEDURES? | IF NO, SELECT THE RATIONALE FOR YOUR DECISION |

| SIGNATURE AND STAR NUMBER OF ASSESSING SUPERVISOR:<br>/s/ Judkins, J, Star # 754 | INCIDENT TRACKING NUMBER:<br>DIV4-2021-9255 | CR NUMBER: | DATE:<br>6/13/2021 | TIME:<br>11:58:22 PM |
|---|---|---|---|---|

## MANSOORI, CHRISTOPHER - LITIGATION - CCSAO - 002732
Any Information and Reports produced from the Cook County Offender Management System (CCOMS) is for internal distribution only.
For an official copy of a report from CCOMS, contact the Business Intelligence Unit at CCSO.DataRequest@cookcountyil.gov



Exhibit C



# COOK COUNTY SHERIFF'S OFFICE
## BUREAU OF INFORMATION AND TECHNOLOGY
### COOK COUNTY OFFENDER MANAGE  ENT SYSTEM
### (CCOMS)



User ID:  N Aguirre

## INCIDENT REPORT

| DIVISION/UNIT/FACILITY: | LIVING UNIT/SPECIFIC LOCATION (I.E., Cell, Courtroom): |
|---|---|
| **DIVISION 6** | **DAYROOM** |
| INCIDENT DATE: | INCIDENT TYPE: |
| 7/6/2021 | **Medical** |
| INCIDENT CATEGORIES: | INCIDENT DETAILS: |
| Medical Emergency | ☐ Injuries / Hospitalization      ☐ OPR Notified<br>☐ Restraints / Force Used        ☐ ADO Notified<br>☐ Weapon(s) Involved<br>☐ Arrest(s) Made |

| INMATE(S) INVOLVED: | BOOKING#: | INMATE ID #: | INVOLVEMENT: | PERSONNEL INVOLVED: | STAR#: | INVOLVEMENT: |
|---|---|---|---|---|---|---|
| James Harris | 20200722078 | 0435670 | Participant | E Lopez06 | 18032 | Involved |

### STATEMENT OF FACTS: (NARRATIVE)

In summary, on 06JUL21 R/O Lopez #18032 was assigned to Division 6 , Tier 2K for the 0700-1500 HRS shift. At approximately 1114 hours while R/O was on the tier receiving a transfer, R/O observed detainee Harris, James #20200722078 laid on the top deck near cell #19, detainee was breathing but unresponsive to verbal commands. R/O notified division 6 Dispensary along with Sgt. Bremer #3052 via radio of a code blue on tier 2K. Sgt. Bremer #3052 and medical staff arrived. Detainee Harris was then escorted off the tier by medical staff via wheel chair to Division 6 dispensary. 911 was activated. Nothing further to report.

| SIGNATURE & STAR NUMBER OF REPORTING PERSONNEL: | DATE/ TIME: | | SIGNATURE & STAR NUMBER OF REVIEWING SUPERVISOR: | DATE / TIME: | |
|---|---|---|---|---|---|
| /s/ Lopez06, E, Star # 18032 | 7/6/2021 | 12:02:10 PM | /s/ Holmes, J, Star # 699 | 7/6/2021 | 12:23:43 PM |

## MANSOORI, CHRISTOPHER - LITIGATION - CCSAO - 002733
Any Information and Reports produced from the Cook County Offender Management System (CCOMS) is for internal distribution only.
For an official copy of a report from CCOMS, contact the Business Intelligence Unit at CCSO.DataRequest@cookcountyil.gov

Exhibit D




# COOK COUNTY SHERIFF'S OFFICE
## BUREAU OF INFORMATION AND TECHNOLOGY
### COOK COUNTY OFFENDER MANAGEMENT SYSTEM
### (CCOMS)

User ID: N Aguirre

## INCIDENT REPORT

| DIVISION/UNIT/FACILITY: | LIVING UNIT/SPECIFIC LOCATION (I.E., Cell, Courtroom): |
|---|---|
| DIVISION 6 | Tier |

| INCIDENT DATE: | INCIDENT TYPE: |
|---|---|
| 10/12/2021 | Security |

| INCIDENT CATEGORIES: | INCIDENT DETAILS: |
|---|---|
| Contraband Confiscated (From Detainee); Disciplinary | ☐ Injuries / Hospitalization    ☐ OPR Notified<br>☐ Restraints / Force Used    ☐ ADO Notified<br>☐ Weapon(s) Involved<br>☐ Arrest(s) Made |

| INMATE(S) INVOLVED: | BOOKING#: | INMATE ID #: | INVOLVEMENT: | PERSONNEL INVOLVED: | STAR#: | INVOLVEMENT: |
|---|---|---|---|---|---|---|
| Maurice Y Robinson | 20191114122 | 808781 | Participant | J Deangeles | 17716 | Witness |

### STATEMENT OF FACTS: (NARRATIVE)

On 12OCT21, R/O DeAngeles #17716 was assigned to Division 6 Tier 2R. At approximately 1115 hours, inmate Robinson, Maurice #20191114122 was returning to 2R from school. I asked inmate Robinson to place his hands on the interlock wall to be searched. Upon searching inmate Robinson, I recovered a Parker Brother's Monopoly game board, plastic pieces, metal pieces, fake money, and 48 count box of Crayola colored pencils.

Also recovered from inmate Robinson were 2 small strips of paper. saturated with a clear liquid, and marked with dosing lines. These strips were wrapped in a kite, which stated " to smoke the small strip and to sell the big one; "I'm gonna hit you hard once my other load drops send me $100;" "these are $10 strips."
Also on the kite are a cash app username, and a zelle phone number where to send the money. Inmate Mcgee, Marquan #20210307042, who is also housed on Tier 2R.

Sgt. Bremer #3052 was present doing a security check on 2R at the time of the recovery. The art supplies and game board were returned to teacher Wisniewski, and after interviewing her teachers claims that they were not given to the inmate. No teachers are claiming to have brought in the game board. The kite and suspect narcotics were placed in evidence bag #M2456638, and will be dropped in the evidence deposit.

Nothing more to report at this time

| SIGNATURE & STAR NUMBER OF REPORTING PERSONNEL: | DATE/ TIME: | SIGNATURE & STAR NUMBER OF REVIEWING SUPERVISOR: | DATE / TIME: |
|---|---|---|---|
| /s/ Deangeles, J, Star # 17716 | 10/12/2021    1:20:59 PM | /s/ Holmes, J, Star # 699 | 10/12/2021    1:43:20 PM |

## MANSOORI, CHRISTOPHER - LITIGATION - CCSAO - 002737
Any Information and Reports produced from the Cook County Offender Management System (CCOMS) is for internal distribution only.
For an official copy of a report from CCOMS, contact the Business Intelligence Unit at CCSO.DataRequest@cookcountyil.gov

Exhibit E



# COOK COUNTY SHERIFF'S OFFICE
## BUREAU OF INFORMATION AND TECHNOLOGY
### COOK COUNTY OFFENDER MANAGEMENT SYSTEM
### (CCOMS)



User ID:  N Aguirre

## INCIDENT REPORT

| SIGNATURE AND STAR NUMBER OF ASSESSING SUPERVISOR: | INCIDENT TRACKING NUMBER: | CR NUMBER: | DATE: | TIME: |
|---|---|---|---|---|
| /s/ Holmes, J, Star # 699 | DIV6-2021-10899 | | 7/6/2021 | 12:23:43 PM |

Run Date:    4/3/2023 14:39                     Incident Number:   DIV6-2021-10899                     Page 4 of 4

## MANSOORI, CHRISTOPHER - LITIGATION - CCSAO - 002736

Any Information and Reports produced from the Cook County Offender Management System (CCOMS) is for internal distribution only.
For an official copy of a report from CCOMS, contact the Business Intelligence Unit at CCSO.DataRequest@cookcountyil.gov



**COOK COUNTY SHERIFF'S OFFICE**
*(Oficina del Alguacil del Condado de Cook)*

**INMATE GRIEVANCE FORM**
*(Formulario de Queja del Preso)*

| CONTROL # | INMATE ID # |
|---|---|
|  |  |

| ! THIS SECTION IS TO BE COMPLETED BY INMATE SERVICES STAFF ONLY ! | *(! Para ser llenado solo por el personal de Inmate Services !)* |
|---|---|

☐ Emergency Grievance
☐ Grievance
☐ Non-Compliant Grievance

☐ Cermak Health Services
☐ Superintendent:_____
☐ Other: _____

**PRINT - INMATE LAST NAME** *(Apellido del Preso):*

**PRINT - FIRST NAME** *(Primer Nombre):*

**INMATE BOOKING NUMBER** *(# de identificación del Preso)*

**DIVISION** *(División):*

**LIVING UNIT** *(Unidad):*

**DATE** *(Fecha):*

## GRIEVANCE GUIDELINES AND SUMMARY OF COMPLAINT

**Your grieved issue must meet all criteria listed below in order to be assigned a control #, to be appealed and/or to exhaust remedies.**

The grieved issue is not one of the following non-grievable matters: inmate classification including designation of an inmate as a security risk or protective custody inmate, or decisions of the inmate disciplinary hearings officer.

The grieved issue must have occurred within the last 15 calendar days unless the allegation is of sexual assault, sexual harassment, sexual abuse or voyeurism. If the grievance includes an allegation of sexual assault, sexual harassment, sexual abuse or voyeurism no time limits exist. If you believe an exception applies please see a CRW (Correctional Rehabilitation Worker.)

The grieved issue must not be a repeat submission of a grievance collected within the last 15 calendar days.

The grieved issue must not be a repeat submission of a grievance that previously received a response and was appealed.

The grieved issue must not be a repeat submission of a grievance that previously received a response and you chose not to appeal the response within 15 calendar days

The grievance issue must not contain offensive or harassing language.

The grievance form must not contain more than one issue.

The grievance issue must not pertain to non-jail related concerns such as with arresting agencies, judicial matters, or medical staff at outlying hospitals, etc.

## DIRECTRICES PARA AGRAVIOS Y RESUMEN DE QUEJA

**El asunto de la queja tiene que satisfacer todo el criterio listado más abajo para obtener un número de control, para ser apelado y/o agotar todos los remedios posibles.**

El asunto de la queja no puede ser ninguno de los siguientes temas, que no se consideran quejas formales: Clasificación del preso incluyendo designación de un inmate a riesgo de seguridad o custodia de protección para los presos, o decisiones del oficial de audiencias disciplinarias para los presos.

El asunto de la queja formal tiene que haber pasado en los últimos 15 días calendarias a menos que la acusación sea de acoso sexual, sexual hostigamiento, sexual abuso. O voyeurism. Si la queja incluye acusaciones de acoso sexual, hostigamiento, voyeurism, o abuso, no existe tiempo límite. Si usted cree que existe una excepción, hable o vea a un Trabajador de Rehabilitación Correccional (TRC/CRW).

El asunto de la queja no puede ser una repetición de una queja sometida en los últimos 15 días calendarias.

El asunto de la queja no puede ser una repetición de una queja previamente recibida y la cual ya ha recibido una respuesta y fue apelada.

El asunto de la queja no puede ser una repetición de una queja previamente reciba y la cual ya ha recibo una respuesta y usted recibida no someter una apelación sobre la decisión dada en los 15 días calendarios.

El asunto de la queja no puede contener lenguaje ofensivo o amenazante

La solitud de la queja no puede contener más de un asunto.

El asunto de la queja no puede corresponder a asuntos no relacionados con la cárcel tal como preocupaciones sobre la agencia de arresto, asuntos judiciales, o empleados médicos de hospitales periféricos, etc.

| REQUIRED - DATE OF INCIDENT *(Fecha del Incidente)* | REQUIRED - TIME OF INCIDENT *(Horad del Incidente)* | REQUIRED - SPECIFIC LOCATION OF INCIDENT *(Lugar Específico del Incidente)* | REQUIRED - NAME and/or IDENTIFIER(S) OF ACCUSED *(Nombre y/o Identificación del Acusado)* |
|---|---|---|---|
|  |  |  |  |

**NAME OF STAFF OR INMATE(S) HAVING INFORMATION REGARDING THIS COMPLAINT:**
*(Nombre del personal o presos que tengan información:)*

**INMATE SIGNATURE :***(Firma del Preso):*

| SUPERINTENDENT/DIRECTOR/DESIGNEE OF A DIVISION/UNIT MUST REVIEW AND SIGN ALL GRIEVANCES ALLEGING STAFF USE OF FORCE, STAFF MISCONDUCT, AND EMERGENCY GRIEVANCES. IF THE INMATE GRIEVANCE IS OF A SERIOUS NATURE, THE SUPERINTENDENT MUST INITIATE IMMEDIATE ACTION. |
|---|

| CRW/PLATOON COUNSELOR (Print): | SIGNATURE: | DATE CRW/PLATOON COUNSELOR RECIEVED: |
|---|---|---|
| SUPERINTENDENT/DIRECTOR/DESIGNEE (Print): | SIGNATURE: | DATE REVIEWED: |

(FCN-73)(NOV 17)    **(WHITE COPY** – INMATE SERVICES)    **(YELLOW COPY** – CRW/PLATOON COUNSELOR)    **(PINK COPY** – INMATE)

Exhibit In



**COOK COUNTY SHERIFF'S OFFICE**
(Oficina del Alguacil del Condado de Cook)

## INMATE GRIEVANCE FORM
(Formulario de Queja del Preso)

| CONTROL # | INMATE ID # |
|---|---|
| | |

! THIS SECTION IS TO BE COMPLETED BY INMATE SERVICES STAFF ONLY !     (! Para ser llenado solo por el personal de Inmate Services !)

☐ Emergency Grievance
☐ Grievance
☐ Non-Compliant Grievance

☐ Cermak Health Services
☐ Superintendent:_____
☐ Other: _____

| PRINT - INMATE LAST NAME (Apellido del Preso): | PRINT - FIRST NAME (Primer Nombre): | INMATE BOOKING NUMBER (# de identificación del Preso) |
|---|---|---|
| | | |
| DIVISION (División): | LIVING UNIT (Unidad): | DATE (Fecha): |
| | | |

### GRIEVANCE GUIDELINES AND SUMMARY OF COMPLAINT

Your grieved issue must meet all criteria listed below in order to be assigned a control #, to be appealed and/or to exhaust remedies.

The grieved issue is not one of the following non-grievable matters: inmate classification including designation of an inmate as a security risk or protective custody inmate, or decisions of the inmate disciplinary hearings officer.

The grieved issue must have occurred within the last 15 calendar days unless the allegation is of sexual assault, sexual harassment, sexual abuse or voyeurism. If the grievance includes an allegation of sexual assault, sexual harassment, sexual abuse or voyeurism no time limits exist. If you believe an exception applies please see a CRW (Correctional Rehabilitation Worker.)

The grieved issue must not be a repeat submission of a grievance collected within the last 15 calendar days.

The grieved issue must not be a repeat submission of a grievance that previously received a response and was appealed.

The grieved issue must not be a repeat submission of a grievance that previously received a response and you chose not to appeal the response within 15 calendar days

The grieved issue must not contain offensive or harassing language.

The grievance form must not contain more than one issue.

The grievance issue must not pertain to non-jail related concerns such as with arresting agencies, judicial matters, or medical staff at outlying hospitals, etc.

### DIRECTRICES PARA AGRAVIOS Y RESUMEN DE QUEJA

El asunto de la queja tiene que satisfacer todo el criterio listado más abajo para obtener un número de control, para ser apelado y/o agotar todos los remedios posibles.

El asunto de la queja no puede ser ninguno de los siguientes temas, que no se consideran quejas formales: Clasificación del preso incluyendo designación del preso. Tal como riesgo de seguridad o custodia de protección para los presos, o decisiones del oficial de audiencias disciplinarias para los presos.

El asunto de la queja formal tiene que haber pasado en los últimos 15 días calendarias a menos que la acusación sea de acoso sexual, sexual hostigamiento, sexual abuso. O voyerismo. Si la queja incluye acusaciones de acoso sexual, hostigamiento, voyerismo, o abuso, no existe tiempo límite. Si usted cree que existe una excepción, hable o vea a un Trabajador de Rehabilitación Correccional (TRC/CRW).

El asunto de la queja no puede ser una repetición de una queja sometida en los últimos 15 días calendarias.

El asunto de la queja no puede ser una repetición de una queja previamente recibida y la cual ya ha recibido una respuesta y fue apelada.

El asunto de la queja no puede ser una repetición de una queja previamente reciba y la cual ya ha recibo una respuesta y usted recibida no someter una apelación sobre la decisión dada en los 15 días calendarios.

El asunto de la queja no puede contener lenguaje ofensivo o amenazante

La solitud de la queja no puede contener más de un asunto.

El asunto de la queja no puede corresponder a asuntos no relacionados con la cárcel tal como preocupaciones sobre la agencia de arresto, asuntos judiciales, o empleados médicos de hospitales periféricos, etc.

| REQUIRED - DATE OF INCIDENT (Fecha del Incidente) | REQUIRED - TIME OF INCIDENT (Horad del Incidente) | REQUIRED - SPECIFIC LOCATION OF INCIDENT (Lugar Específico del Incidente) | REQUIRED - NAME and/or IDENTIFIER(S) OF ACCUSED (Nombre y/o Identificación del Acusado) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

NAME OF STAFF OR INMATE(S) HAVING INFORMATION REGARDING THIS COMPLAINT:
(Nombre del personal o presos que tengan información:)

INMATE SIGNATURE: (Firma del Preso):

SUPERINTENDENT/DIRECTOR/DESIGNEE OF A DIVISION/UNIT MUST REVIEW AND SIGN ALL GRIEVANCES ALLEGING STAFF USE OF FORCE, STAFF MISCONDUCT, AND EMERGENCY GRIEVANCES.  IF THE INMATE GRIEVANCE IS OF A SERIOUS NATURE, THE SUPERINTENDENT MUST INITIATE IMMEDIATE ACTION.

| CRW/PLATOON COUNSELOR (Print): | SIGNATURE: | DATE CRW/PLATOON COUNSELOR RECIEVED: 11/10/2021 |
|---|---|---|
| SUPERINTENDENT/DIRECTOR/DESIGNEE (Print): | SIGNATURE: | DATE REVIEWED: |

(FCN-73)(NOV 17)     (WHITE COPY – INMATE SERVICES)   (YELLOW COPY – CRW/PLATOON COUNSELOR)     (PINK COPY – INMATE)

Exhibit E

Christopher Mansoori
20191007189
2700 S. California
Chicago IL 60608



Prisoner Correspondence
United States District Courthouse
219 S. Dearborn Street
Chicago IL 60604

07/30/2024